Filed 10/17/22 In re F.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| In re F.D., a Person Coming Under the Juvenile Court Law. | C095368 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.F. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. STKJVDP20190000457) |

Mother C.F. and father J.D., parents of the minor, appeal from the juvenile court's order terminating parental rights and freeing the minor for adoption. (Welf. & Inst. Code, §§ 366.26, 395.)[1] Parents contend the juvenile court erred by denying their request for a

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

bonding study, finding the beneficial parental relationship exception to adoption did not apply, and failing to comply with the inquiry and notice provisions of the Indian Child Welfare Act (25 U.S.C. § 1900 et seq.) (ICWA). Mother also contends the court erred in finding the San Joaquin County Human Services Agency (Agency) provided her with reasonable services. Finding none of the claims have merit, we will affirm the juvenile court's orders.

## I. BACKGROUND

The three-year-old minor was detained on November 14, 2019, after mother, who had a history of untreated mental health issues, attacked father while the minor slept in another room, resulting in her arrest for violation of an active restraining order and domestic violence.

The social worker reported there had been nine prior Child Protective Services referrals for the family, most recently a July 2019 referral involving mother's arrest for infliction of corporal injury to a spouse/cohabitant and threatening crime with intent to terrorize, and an October 2019 referral involving mother's arrest for willful cruelty to a child and domestic violence. Both incidents occurred despite an active restraining order against mother. Following mother's July 2019 arrest, parents agreed to accept services, obtain a developmental assessment for the minor, and obtain training on hygiene and bathing issues, and mother agreed to receive mental health counseling and remain medication compliant. Parents reportedly failed to follow through with services, appointments, or counseling.

Mother was diagnosed with schizophrenia and has suffered from mental health issues since the age of 12 or 13. She has been in and out of mental health facilities and has repeatedly gone on and off her medication. Father, who suffers from a brain injury and other developmental delays, confirmed he had two loaded firearms under his bed and a third firearm in the room—all accessible to the minor. Father was unable to demonstrate he understood the severity of mother's mental health issues or the potential

2

danger she could pose if she returned home.  He also admitted he would allow mother back into the home and would not prevent mother from having contact with the minor.

The Agency filed a dependency petition alleging failure to protect and no provision for support (§ 300, subds. (b)(1) and (g)).  The juvenile court ordered the minor detained, with supervised visitation for parents.  At the jurisdiction hearing on January 9, 2020, the court sustained the petition as amended and granted the Agency discretion to arrange separate supervised visits for each parent.

The February 2020 disposition report stated father had little understanding of the problems causing the Agency to become involved with the family.  He downplayed the recent domestic violence incidents, claimed mother was "100% safe" and he was protective.  He was unaware of how often mother was noncompliant with her medication.  Father failed to understand how keeping a loaded firearm in the home where the minor had access posed a risk of harm to the minor.  He also struggled to understand that the court was not only looking for him to engage in services but also to demonstrate behavioral changes as a result of those services.  It was also noted that, prior to the restraining order being lifted, father repeatedly allowed mother to violate the order by staying in the home and interacting with the minor.

The minor was placed with the paternal grandmother and the paternal uncle.  The caretakers reported the minor had " 'uncontrollable temper tantrums' " and " 'major anger issues that seem[ed] to stem from rage.' "  The minor tended to exhibit those behaviors following visits with parents. While parents' visits were still separate, the caretakers reported inappropriate dialogue between parents and the minor during a video visit.  Joint visits with both parents resumed briefly, until the parents engaged in a verbal altercation which required the minor to be removed from the visitation room and visits were once again separated.

The parents also had separate child family team (CFT) meetings.  In mother's CFT meeting, following a discussion of mother's untreated mental health issues and concerns

3

regarding the potential for her to have a psychotic episode while caring for the minor, mother agreed to participate in individual counseling, couples counseling, and parenting classes and to remain compliant with her medication. She actively participated in parenting classes and individual counseling. In father's CFT meeting, father agreed to participate in parenting classes, individual counseling, and couples' counseling and to educate himself on gun safety. He reportedly participated in parenting classes and individual counseling. Thereafter, the court ordered reunification services for parents and continued out-of-home placement for the minor. The court authorized psychological evaluations for both parents and granted the Agency discretion to increase visits with the minor and set joint visits.

According to the August 2020 status review report, while both parents were participating in or had completed portions of their case plan and the criminal protective order against mother had been lifted, they continued to minimize the domestic violence incidents and demonstrated a lack of understanding of the severity of mother's mental health issues.

Mother's psychological evaluation was completed by Sidney Nelson, Ph.D., who reported that mother lacked insight into her psychotic disorder and her need for medication, and she did not seem to understand how her psychotic episodes could place the minor at risk of harm. Dr. Nelson stated it was "a reasonable probability" that mother would discontinue her medication once the Agency and the juvenile court were no longer involved. Dr. Nelson reported that mother minimized the incidents of domestic violence and, while mother was actively involved in her case plan services, her treatment amenability was "poor," and her ability to make meaningful and sustainable progress was likely to be "quite marginal." Dr. Nelson recommended mother be referred to domestic violence counseling and stated she would need to be closely monitored by a psychiatrist regarding her antipsychotic medication compliance.

Father's psychological evaluation was completed by Dr. Gary Cavanaugh, who diagnosed father with attention deficit hyperactive disorder (ADHD), learning disabilities, neurocognitive disorder, an unspecified personality disorder, and a history of alcohol use disorder. Dr. Cavanaugh noted that, although father truly cared for the minor, he had a codependent relationship with mother and had poor judgment. Dr. Cavanaugh was not certain that parenting classes and counseling were enough to make up for father's impairments. There were concerns regarding father's delay in intervening when mother was having psychotic episodes, as well as father's decision to keep a loaded firearm under the bed and accessible to the minor. Dr. Cavanaugh concluded as follows: "I must be honest [in] saying that I cannot think of any additional resources that the father could undergo that would improve his ability to complete a unification plan."

In January 2021, the court continued the minor's out-of-home placement and ordered the Agency to increase parents' visitation with the minor.

In March 2021, during a home visit, the social worker learned mother was not taking her medication, which caused her to yell at father and make suicidal threats. When father attempted to take mother to the hospital, mother jumped out of the car and ran into traffic screaming "rude things" about father. Law enforcement eventually took mother in on a psychiatric hold. Thereafter, mother stabilized on new medication.

In May 2021, the Agency reported that both parents completed parenting classes and individual counseling, but the Agency recommended mother be referred to group domestic violence counseling. Both parents were compliant with their other case plan services. The Agency concluded that, although parents had participated in and completed their case plan services, the events of the past three months made it clear that parents had not benefited enough from services to meet the case plan objectives and provide a safe home for the minor free of neglect and abuse. Due to the statutory timelines, the Agency recommended the court terminate parents' reunification services.

5

At the July 12, 2021, review hearing, mother testified she completed her case plan services but for domestic violence counseling which was in progress. She was seeing a psychiatrist monthly and she maintained regular visitation with the minor. Mother testified she had been taking her medication regularly and had become more stable but for an incident in March 2021 when she experienced issues with a new medication. The March 2021 incident taught her that schizophrenia is a very serious disease, and she needed more appointments with the psychiatrist at the National Alliance of Mental Health Institute.

On cross-examination, mother stated she had been dealing with schizophrenia since 2012 and had always taken her medication, and she denied any inconsistency in her medication regimen during the dependency case. Father helped her maintain her medication compliance by buying her a pill box that showed the days of the week. Mother changed the medications she took for schizophrenia numerous times prior to and during the course of the case and she did not realize when she was having psychotic episodes until her family pointed it out to her. She denied making suicidal statements during the March 2021 episode, and she denied being noncompliant with her medications that day. She did not recall telling Dr. Nelson that she did not need to be on medication, nor did she recall the specifics of several of her prior incidents of physical aggression.

The court found parents had received 20 months of reasonable reunification services from the Agency. It found that, while parents completed most of their case plan services, significant issues remained regarding mother's mental health issues and father's significant cognitive delays such that return of the minor would create a substantial risk of detriment to the minor. The court also found there was not a substantial probability the minor would be returned to parents within the statutory period, terminated reunification services to parents, and set the matter for a section 366.26 hearing.

The November 2021 report stated parents were having weekly supervised visits with the minor in the caretaker's home, and weekly supervised teaching/coaching visits

6

with the minor by video. The caretakers reported the visits were pleasant and beneficial for the minor. The minor was doing well in his placement with the paternal grandmother and paternal uncle, approved resource family caretakers with whom he was attached. He was making progress in his developmental skills and showing significant progress in his communication and socialization skills. The minor's therapist reported the minor had met all of his treatment goals, noting that "stability and consistency has contributed to his increased ability to regulate his emotions and have a better frustration tolerance." The Agency noted parents had participated in and completed their case plan services but had not benefited enough from those services to meet the case plan objectives or provide a safe and nurturing environment for the minor. The caretakers were meeting the minor's needs and were ready to proceed with adoption. The Agency recommended the court terminate parental rights and free the minor for adoption.

On November 29, 2021, two weeks before the contested section 366.26 hearing date, mother requested a bonding study, asserting it would be detrimental to terminate the existing bond between her and the minor without an assessment by an expert to determine if termination of parental rights was in the minor's best interest. The Agency objected to the request, arguing the minor had been out of the parents' care for nearly half his life and had made significant progress due to the stability and consistency of being with his caregivers.

The court heard mother's request for a bonding study on December 14, 2021. Mother argued a bonding study was appropriate due to the minor's age, the fact that parents had consistent visits with the minor throughout the case, and the fact that the minor reportedly enjoyed interacting with parents. The minor's counsel argued, and the Agency concurred, that mother's request was untimely, would cause undue delay, and would provide little information not already available from the visitation notes. The Agency further argued that mother's request was insufficient to meet a prima facie showing that a bonding study would be probative, providing no basis for the request other

7

than the incidental benefit derived by the minor via his relationship with his parents. The court denied mother's request, noting it was made on "the eve of the trial" and would create undue delay.

Oral argument pertaining to the contested section 366.26 hearing immediately followed. Both parents argued their bond with the minor was strong enough to fall within the beneficial parental relationship exception to adoption. The court noted parents provided "no testimony, no evidence" to support the beneficial parental relationship exception and found neither it nor any other exception applied. The court terminated parental rights and freed the minor for adoption.

## II. DISCUSSION

*A. Reasonable Services Finding*

Mother contends the juvenile court abused its discretion when it found the Agency provided her with reasonable services. She claims the Agency failed to provide her with counseling necessary to give her greater insight into the dangers of her mental illness or to provide her assistance in getting more frequent appointments with her psychiatric service providers. The claim lacks merit.

Although mother failed to address the appealability of this contention in this appeal, we note that mother made this contention in a petition for extraordinary writ, taken from the July 21, 2021 review hearing, which was denied summarily on the merits. (*Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501; Cal. Rules of Court, rule 8.452.) We take judicial notice of the court file in that proceeding—case No. C094449. (Evid. Code, § 452, subds. (c), (d).) While mother may re-raise the issue she raised in her petition for extraordinary writ, she "is limited to the same issue on the same record (§ 366.26, subd. (*l*)(1)(B)) and thus is destined on appeal to receive the same result." (*Joyce G., supra,* at p. 1514.)

When the juvenile court orders reunification services, the child welfare agency must tailor those services to the needs of the family and design them to alleviate the

8

circumstances that gave rise to the child becoming a dependent of the court. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.) The child welfare agency "must make a good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345; see *In re K.C.* (2012) 212 Cal.App.4th 323, 329-330.) The Agency's efforts to provide reunification services do not have to be perfect, but they must be reasonable given the circumstances of the case. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697 (*T.G.*).)

We review the trial court's reasonable services findings for substantial evidence. (*Amanda H. v. Superior Court, supra*, 166 Cal.App.4th at p. 1346; *T.G., supra,* 188 Cal.App.4th at p. 697.)

Here, the minor's removal stemmed from parents' history of domestic violence, mother's untreated mental health issues, and mother's substance abuse issues. The Agency identified mother's need for individual counseling, couples counseling, parenting and domestic violence classes, mental health services (and medication compliance) and a psychological evaluation, and the teaching demonstrating homemaker program. The psychological evaluation by Dr. Nelson further identified recommended strategies and services and discussed her poor treatment amenability. Over the course of the dependency proceedings, mother received 20 months of counseling and other services, in addition to the safety net services she was provided prior to the minor's removal. She participated in all of them and completed most, with the exception of the domestic violence classes to which she was not referred until later. Yet, reported issues with lack of insight and inability to understand the importance of medication compliance continued to plague mother who, despite the implementation of services, continued to lack the

ability to function in a safe manner, as evidenced by her psychotic episode in March 2021 despite having completed over a year of services.

Focusing on one of Dr. Nelson's recommendations that she needed greater insight into the dangers of her mental illness, mother argues she was not provided with the specific type of counseling that would have provided her that insight, nor did the Agency assist her in getting monthly psychiatric appointments rather than every three months. But the services provided by the Agency do not have to be perfect, only reasonable given the circumstances of the case. (*T.G., supra*, 188 Cal.App.4th at p. 697.) Under these circumstances, the Agency offered mother services designed to remedy the problems that resulted in removal, maintained contact with her throughout, and made reasonable efforts to assist her when compliance proved difficult—including individual counseling, as provided in the case plan. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) Yet, mother was less than forthcoming when she was having difficulties with her medications and, rather than communicating with the social worker and getting help, she eventually had a psychotic episode, which landed her in the hospital on a psychiatric hold. Despite having fully participated in the services she was provided, mother continued to lack the ability to understand the dangers associated with medication noncompliance and to minimize the incidents of domestic violence with father.

Under these circumstances, we conclude the juvenile court did not err in finding the Agency provided mother with reasonable services.

Mother raises claims regarding the provision of services to father and potentially returning the minor to father, either with or without mother's presence. Mother lacks standing to argue the finding of reasonable services as to father because the challenged order has no impact on her parent-child relationship (*In re Paul W.* (2007) 151 Cal.App.4th 37, 62 [where dependency case is no longer in reunification, parent has no standing to assert errors affecting rights of other parent]), particularly in light of the fact that father never raised the issue himself. Mother fails to demonstrate how the

10

alleged error affects her own interests. (*In re Crystal J.* (2001) 92 Cal.App.4th 186, 189.) As for mother's claim that the Agency failed to show the minor would be at risk if returned to father, mother failed to raise the issue in the juvenile court and has therefore forfeited it on appeal. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 819-820; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 641.)

B.      *Bonding Study*

Parents contend the juvenile court erred when it denied mother's request for a bonding study because, they claim, the Agency's reports lacked sufficient information regarding the nature and quality of the minor's relationship with them. Thus, they contend, the bonding study was "essential" to the determination of whether the beneficial parental relationship exception to adoption applied. We find no error.

As a preliminary matter, parents never called into question the adequacy of the Agency's report, nor did they object to the juvenile court's reliance on those reports. As such, they have forfeited any such claim on appeal in that regard. (See *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [failure to object to adequacy of adoption assessment]; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412 [failure to object to inadequacy of adoption assessment]; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 [failure to object to lack of preliminary assessment of prospective guardian]; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C.*) [failure to object to lack of bonding study].) In any event, the court's denial of mother's request for a bonding study was not an abuse of discretion. Under Evidence Code section 730, a court may appoint an expert to study the bond between a parent and a child. (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.) Thus, the juvenile court has broad discretion whether to order a bonding assessment. (*Id.* at pp. 1339-1340; *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1195 (*Richard C.*).) On review, we must determine "whether,

11

under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Lorenzo C., supra*, at p. 1341.) We review the court's denial of a request for a bonding study for abuse of discretion. (*Ibid*.)

"The kind of parent-child bond the court may rely on to avoid termination of parental rights . . . does not arise in the short period between the termination of services and the section 366.26 hearing." (*Richard C., supra*, 68 Cal.App.4th at p. 1196.) When the juvenile court makes a determination of the nature and quality of the parent-child bond, the child generally has been in the dependency process for a significant period of time, and the characteristics of the bond should be apparent. (*Ibid.*) Such is the case here.

In her request, mother asserted she and father maintained visitation with and had a "strong bond" with the minor, who was excited to see them and who had lived with them his entire life before being removed. Mother's counsel noted the social worker's statement in the section 366.26 report that parental visits were beneficial to the minor and he enjoyed interacting with his parents. Without identifying any particular failings in the Agency's reports over the dependency period, mother concluded an expert was needed to assess the minor's bond with them to determine if termination of parental rights was in the minor's best interest. To the contrary, the nature of the bond was apparent from the reports and visitation logs over the approximately two years the minor was in the dependency process. As noted by mother's counsel, the section 366.26 report included the social worker's conclusion that parental visits were beneficial to the minor and he enjoyed interacting with his parents. The grandmother reported that father's weekly visits, which she supervised in her home, were pleasant and beneficial to the minor. Based on that record, the court was well aware of the nature of the bond between parents and the minor.

Additionally, mother provided absolutely no justification for waiting until the eve of the section 366.26 hearing—almost four months after her reunification services were terminated—to file her request. The reason for making the bonding study request was to assist in establishing the beneficial parental relationship exception to adoption. As we have noted, the kind of parent-child bond the court may rely on to avoid termination of parental rights based on that exception does not arise in the short period between the termination of services and the section 366.26 hearing. (*Richard C., supra*, 68 Cal.App.4th at p. 1196.) There was simply no valid reason for mother to have waited nearly four months to make her request, which would then necessarily require a last minute *and* substantial continuance of the section 366.26 hearing. A juvenile court has broad discretion in deciding whether to grant a continuance. (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) However, in dependency cases, continuances are disfavored, shall be granted only upon a showing of good cause, and shall not be granted if to do so would be contrary to the minor's interests. (§ 352; *In re David H.* (2008) 165 Cal.App.4th 1626, 1635; *In re Gerald J., supra,* at p. 1187.) The court did not abuse its discretion in denying mother's request for a bonding study.

C.      *Beneficial Parental Relationship Exception to Adoption*

Parents next claim the court erred by finding the beneficial parental relationship exception did not apply because it failed to engage in the proper analysis required by *In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*). In particular, the parents claim the court failed to determine the extent of visitation between the minor and the respective parents or whether the minor had the kind of relationship with parents which would foreclose termination of parental rights. This claim lacks merit as well.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]'

13

[Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at p. 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) For the beneficial parental relationship exception to apply, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra,* at p. 636.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Id.* at pp. 639-640.)

To the extent parents' claim the court failed to state, on the record, its reasonings and findings in denying application of the beneficial parental relationship exception, the court is not required to make those findings on the record. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156, 1161 [no requirement that juvenile court make specific findings when it finds beneficial parental relationship exception does not apply].)

In any event, the fact that parents consistently visited the minor was undisputed. In fact, the Agency reported those visits generally went well. As for the second and third elements, parents did not meet their burden to establish either that the minor had "a substantial, positive, emotional attachment" to them, or that termination of that attachment would be detrimental to the minor (*Caden C., supra,* 11 Cal.5th at p. 636) other than offering conclusory statements that there was a bond which should not be severed. On the other hand, the Agency provided the court with sufficient evidence, including reports and visitation logs, for the court to determine the minor did not have the kind of relationship with parents that would trigger the beneficial parental relationship exception and foreclose termination of parental rights.

We conclude the juvenile court did not err in finding the beneficial parental relationship exception did not apply.

D.     ICWA

Finally, parents claim that, while "neither the duty of further inquiry nor ICWA's notice provisions are at issue because no one has contended there is 'reason to believe' that the children are Indian children," the Agency failed its duty to make initial inquiry "to gather information that could have triggered additional duties and 'heightened requirements' " resulting in prejudicial error. We disagree.

The juvenile court and the social worker asked both parents if they had any known Indian ancestry. Father indicated he "might have Apache ancestry from Kansas." He completed an ICWA-020 form to that effect. Mother denied having any Indian heritage, confirming as much in her ICWA-020 form. Neither parent could provide any additional information regarding extended family members, tribes, or tribal lands. The maternal grandmother completed an ICWA-020 form stating she had no known Indian heritage.

On May 29, 2020, the Agency sent ICWA notices to the Bureau of Indian Affairs (BIA) and eight Apache Tribes (Apache Tribe of Oklahoma, Fort Sill Apache Tribe of Oklahoma, Jicarilla Apache Nation, Mescalero Apache Tribe, San Carlos Apache Tribe,

15

Tonto Apache Tribe of Arizona, White Mountain Apache Tribe, and Yavapai-Apache Nation). The notices contained information about father, the paternal grandparents, and the paternal great-grandparents. Four of those tribes responded stating the minor was neither registered nor eligible for membership. The remaining four tribes and the BIA never responded. The Agency updated the court twice on the status of the responses from the four remaining tribes and the BIA, reporting responses from those entities were never received. On January 28, 2021, the court found the ICWA did not apply.

As this court recently explained: " The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' [Citation.]" (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an "Indian child" as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The juvenile court and the social services department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).)

"[S]ection 224.2 creates three distinct duties regarding [the] ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.,* subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section

16

224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

When there is reason to believe the child is an Indian child, further inquiry is necessary to help determine whether there is reason to know the child is an Indian child, including: "(A) Interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3[;] [¶] (B) Contacting the [Bureau] and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility[;] [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility. Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the [ICWA] [citation]. Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2).) There is no need, however, to continue on to section 224.2, subdivision (e)(2)(B) and (C) if the inquiry contemplated in section 224.2, subdivision (e)(2)(A) is completed and fails to yield information from which a specific tribal affiliation could be deduced.

Claims of inadequate inquiry into a child's Native American ancestry are reviewed for substantial evidence. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) "We

17

must uphold the [juvenile] court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)

Father claims that while the ICWA notices contain pertinent information regarding the paternal line of ancestors, the record contains no information about if or when the Agency inquired of extended family members regarding possible Indian ancestry. As the Agency aptly notes, there is little doubt that the paternal relatives were interviewed and provided the information contained in the ICWA notices because father informed the Agency that he could not provide any additional information when he completed his ICWA-020. Anticipating this response, father argues the Agency failed its duty to document its ICWA inquiry efforts. (*In re Michael V.* (2016) 3 Cal.App.5th 225, 235-236 [appellate court remanded with express instructions for agency to notify the court of its actions].) But a response to a reason to believe inquiry under section 224.2, subdivision (e) "does not require that the Department report its inquiry efforts to the juvenile court in the form of a declaration or in any particular form at all." (*In re M.W.* (2020) 49 Cal.App.5th 1034, 1046.) In any event, as previously discussed, the detailed information contained in the ICWA notices could only have come from the paternal relatives; thus, any omission of statements regarding the Agency's inquiry efforts did not result in any prejudice to father.

Mother argues separately that the ICWA noticing was incomplete because it failed to include the Fort McDowell Yavapai Nation, one of the Apache tribes. Mother cites the Fort McDowell Constitution, the case *In re Glorianna K.* (2005) 125 Cal.App.4th 1443, 1447, and an Internet web site as evidence that the Fort McDowell Yavapai Nation was formerly known as the Fort McDowell Mohave-Apache Tribe and should have received ICWA notice as well.

The Agency argues it used the most recent list of designated Tribal agents for service when the ICWA notices were completed in April and May 2020, and neither the

April 2020 nor the October 2021 list of designated Tribal agents showed the Fort McDowell Yavapai Nation to be one of the federally recognized Apache Tribes. (85 Fed.Reg. 24004 (April 30, 2020); 85 Fed.Reg. 54709 (October 4, 2021).) Thus, the Agency had no obligation to send ICWA notices to the Fort McDowell Yavapai Nation. We agree with the Agency.

The ICWA notices in *In re Glorianna K.* were sent in 2003. (*In re Glorianna K., supra,* 125 Cal.App.4th at pp. 1446-1447.) The BIA's official 2003 list of federally recognized tribes includes the "Fort McDowell Yavapai Nation, Arizona (formerly the Fort McDowell Mohave-Apache Community of the Fort McDowell Indian Reservation)." (68 Fed.Reg. 68181 (Dec. 5, 2003).) Thus, the 2003 notices sent in *In re Glorianna K.* were properly sent to the Fort McDowell Mohave-Apache Community. In 2020, however, when these notices were sent, the Fort McDowell Yavapai Nation was no longer identified as an Apache tribe in the Federal Register's list of federally recognized tribes. While the Fort McDowell Yavapai Nation may have been Apache at one point, based on the relevant federal registers, it was not at the time of these dependency proceedings.

As for mother's assertions regarding the meaning of the various clauses in the Fort McDowell Constitution as found on an Internet web site, we have said many times, the Agency "is not required to 'cast about' for information or pursue unproductive investigative leads" (*In re D.S., supra*, 46 Cal.App.5th at p. 1053) as mother would have had the Agency do here. The identification and status of federally recognized tribes is the task of the BIA. Here, the Agency sent ICWA notices to the BIA and did not receive a response, suggesting the BIA took no issue with the absence of the Fort McDowell Yavapai Nation from the list of Apache tribes requiring notice. Accordingly, we find no error in the ICWA notices.

19

## III. DISPOSITION

The juvenile court's orders are affirmed.

/S/

RENNER, J.

We concur:

/S/

DUARTE, Acting P. J.

/S/

EARL, J.